BELOIT CORPORATION, Plaintiff,

v.

J.M. VOITH, GMBH, Defendant.

Civ. A. No. 84–0846–R.

United States District Court,
E.D. Virginia,
Richmond Division.

Jan. 16, 1986.

William C. Stueber, Hill, Van Saten, Steadman & Simpson, Chicago, Ill., Dirk Veneman, Beloit, Wis., Alexander N. Simon, James J. Burns, Wallerstein, Goode & Dobbins, Richmond, Va., for plaintiff.

Robert C. Faber, Jerome M. Berliner, Ostrolenk, Faber, Gerb & Soffen, New York City, Michael W. Smith, Warren D. Harless, Christian, Barton, Epps, Brent & Chappell, Richmond, Va., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

RICHARD L. WILLIAMS, District Judge.

### I. FINDINGS OF FACT:

#### A. JURISDICTION AND VENUE:

1. Defendant J.M. Voith, GmbH, has sold, through its wholly owned division, Voith Brazil, a papermaking machine to the Chesapeake Corporation of Virginia, of West Point, Virginia. The papermaking machine sold by Voith is Chesapeake's machine PM3, containing a press roll with drive known as a Profil roll. Plaintiff Beloit Corporation alleges that this Profil roll and its drive system infringes Beloit's U.S. Patent 3,889,334.

2. The contract of sale for the papermaking machine PM3 contained an option for the purchase of an extended nip press which Beloit contends is an infringement of its U.S. Patents Re. 30,268 and Re. 31,923. This option was exercised by Chesapeake Corporation on about October 19, 1984.

3. Plaintiff Beloit is a corporation of the State of Delaware, having its principal place of business at 1 St. Lawrence Avenue, Beloit, Wisconsin 53511. Through its paper machinery division, Beloit is engaged in the manufacture and sale of paper as well as in the research and development of papermaking machinery.

4. Defendant Voith is a business organization of the Federal Republic of Germany, having an office and place of business at Postfach 1940, D–7920, Heidenheim, West Germany. Voith is a manufacturer of papermaking machinery and sells such machinery in the United States and within this District.

5. Beloit is the assignee of all right, title and interest in U.S. Patent Re. 30,268.

6. Beloit is the assignee of all right, title and interest in U.S. Patent Re. 31,923.

7. Beloit is the assignee of all right, title and interest in U.S. 3,889,334.

8. Beloit is the assignee of all right, title and interest in U.S. Patent 3,783,097, the parent of Re. 30,268.

9. Beloit is the assignee of all right, title and interest in U.S. Patent 4,287,021, the parent of Re. 31,923.

## B. JUSTUS REISSUE PATENT and the VOITH FLEXONIP PRESS:

### a. *General Description of Patent:*

1. U.S. Re. 30,268 is a U.S. Reissue Patent, which issued to Edgar J. Justus on May 6, 1980. It was assigned to plaintiff Beloit Corporation. It is hereinafter referred to as the Justus reissue. The Justus reissue was based upon Application No. 833,808, filed September 16, 1977.

2. The Justus reissue is a reissue of U.S. Patent 3,783,097 which issued to Edgar J. Justus on January 1, 1974, based upon Application No. 258,103, filed May 30, 1972.

3. The Justus reissue concerns a shoe type press for a papermaking machine (Fig. 2 of patent) wherein a concavely curved shoe 17 is urged toward a driven roll 9 to operate in opposition thereto. Passing between the shoe 17 and the roll 9 is a multi-layered sandwich consisting of a web W of pulp stock including water which is to be removed at the press, a felt belt F on one side of the web W to absorb water pressed from the web 4, and a liquid impervious belt 10 which passes over the surface of the stationary shoe 17 and travels with the rotating roll 9 and the above-described sandwich W, F, 10.

### b. *Development of the Invention:*

4. During the mid-sixties, Beloit's Research and Development Department formed an Applied Physics Group.

5. One of the projects assigned to this group was a study of wet pressing.

6. A computer or simulation model of wet pressing was used during 1968 to determine what could be learned about wet pressing.

7. The computer simulation revealed that time in the nip was a much more important factor in the dewatering process in the press than Beloit had previously realized.

8. As a result of that discovery, Beloit Research initiated a project to study more specifically the potential of residence time in the press nip to remove more water in the wet press.

9. In early 1969, Beloit's Research started a project to determine if there would be a viable way of identifying or of manufacturing a press that would have a longer nip residence time.

10. Various possible alternatives were considered.

11. The alternatives were selected from ideas and concepts from members of the Applied Physics Working Group on wet pressing.

12. The Research Group arrived at the concept of a tensioned belt wrapping a roll as one way of achieving a long residence time in the nip.

13. It considered as well the idea of shoes loading a compressed sandwich of belts and felt and paper.

14. The Research Group concentrated on one design utilizing a four roll arrangement where one of the rolls is the press roll that is being wrapped, two other rolls are used to define the wrap of the belt on the press roll, and the fourth roll was used for tensioning and guiding.

15. Such a tension belt arrangement was built during 1969 and large amounts of data using the tension belt at different nip lengths and different speeds, and different pressures were collected.

16. As a result of these experiments on the tension belt, the Group became convinced that there were significant gains to be made in water removal by extending the length of the nip to achieve longer dwell time. The length of a "nip" is normally thought of as the range between where

pressure starts and pressure ends (whether or not dewatering occurs at all or over the entire length or only part of the length of the nip).

17. The Research Group also found what they considered to be some limitations in the ability of the belts and materials to reach the pressures that were desired in the press nip primarily because of failure of the belt materials under tension.

18. Prior to 1976, at least seven alternative structures were considered by Beloit, one of which was pursued in the form of opposed water lubricated hydrostatic shoes with opposed belts in between.

19. On the hydrostatic bearing, water lubrication was the only lubrication contemplated.

20. In 1975, Beloit considered more seriously oil lubrication.

21. A K–T analysis was done analyzing a number of design alternatives available to Beloit.

22. As a result of this analysis, the design configuration known as the X–8 was chosen.

23. In 1977, work began at Beloit Research on the Experimental X–8 extended nip press.

24. The configuration of the X–8 experimental extended nip press tested at Research was in the configuration shown in Figure 1 of Beloit U.S. Patent No. 4,201,-624.

25. An X–1 experimental extended nip press was built at Research between the fall of 1977 and the spring of 1978.

26. The X–1 machine and the X–8 machine are essentially the same except that the X–1 has a single shoe and the X–8 has a double shoe.

27. The X–1 experimental test machine and the X–8 experimental test machine were simultaneously used for test purposes.

28. Between 1978 and 1979, Beloit transferred the technology from the X–1 unit to a commercial unit.

29. Beloit's first commercial extended nip press was the Springfield No. 1 extended nip press for Weyerhauser.

30. The startup of the first Extended Nip Press built by Beloit for the Weyerhauser Springfield No. 1 Machine occurred during December of 1980, and encountered no specific problems so that a backup conventional two-roll press which Weyerhauser had also bought in case problems would develop, was never used.

31. For the period 1968 to 1977, eighteen man years were devoted to extended nip press research and development.

32. The costs for research and development for the ENP from 1968 to 1977 was $720,000.

33. During the period 1977 through 1980, $330,000 was expended for a full size pilot machine called X–1 and $582,000 was expended for an experimental pilot machine called X–8.

34. Beloit's extended nip press, as sold commercially, has experienced commercial success. It was selected by Weyerhauser Corporation after Weyerhauser did an extensive search for new technology in papermaking around the world.

35. Beloit has manufactured and sold 15 extended nip presses to the industry since its commercial introduction in 1981.

36. The extended nip press made and sold by Beloit sells for a substantially higher price than two roll presses of other designs.

c. *Prosecution of the Justus Reissue:*

37. Beloit claims that Voith's Flexonip Press infringes claims 1, 3, 10, 11, 12, and 18. Claims 1 and 10 are independent claims. Claims 3, 11, 12 and 18 are dependent on claim 1.

38. To interpret claims 1 and 10, it is necessary to look at the prosecution history of the reissue.

39. The application for U.S. Patent Re. 30,268 was filed after Beloit learned of East German Patent 79,919.

40. East German Patent 79,919 concerns a shoe type press for a papermaking machine wherein a shoe 6 (illustrated as being flat but described as being concave in the alternative) is urged toward driven roll 3 to operate in opposition thereto. Passing between the shoe 6 and the roll 3 is a multi-layered sandwich consisting of a web 4 of pulp stock including water which is to be partly removed at the press, a felt 9 on one side of the web 4 to absorb water pressed from web 4, and a belt 10 which passes over the surface of the stationary shoe 6 and travels with rotating roll 3 and with the above described sandwich 4, 9, 10.

41. The East German patent is designed to accomplish better water removal.

42. The East German Patent 79,919 discloses an extended nip press with a shoe, shaped and supported to provide an extended nip with a relatively longer oncoming, pressure-increasing part and a relatively shorter offrunning, pressure-decreasing part.

43. The East German patent was fully considered by the Examiner during the prosecution of the Reissue Patent 30,268.

### i. *Shoe Substantially the Same Radius as the Roll:*

44. During the prosecution of the patent, Beloit described the distinction between its invention and the East German patent as follows:

"[A]pplicant's arrangement operates under principles not disclosed by the prior art in having a structure whereby a dewatering pressure is built up at the leading edge of the shoe, and this dewatering pressure is maintained along the length of the shoe to afford increased time under pressure for water to travel out of the fibers of the web into the felt, and the pressure is relieved at the trailing edge of the shoe. In the East German patent, the patentee teaches forming a shoe which has a point of maximum pressure in the gap.... The patentee teaches providing a shoe which is shaped so that pressure build up is to one of a point of highest pressure, and then a release." (File Wrapper Re 30,268 at 11–12).

45. Beloit further claimed that the East German patent stressed shifting the point of maximum pressure from midpoint of the nip closer to the end of the nip. To illustrate this, Beloit argued that "one skilled in the art of dewatering by pressing in a paper machine would consider the pressure profile of a web passing through a nip. In a standard two roll nip, the pressure profile is parabolic and symmetrical. As the web enters the nip between the rolls, it builds up parabolically and the pressure build up and release are symmetrical." (File Wrapper Re. 30,268 at 12). According to Beloit, the East German patent "teaches a shift in the location of the point of maximum pressure." (File Wrapper Re. 30,268 at 13).

46. In contrast, Beloit claimed that its invention stressed "the importance of the time under pressure." The "web is brought up to *the maximum pressure* for water migration and then is maintained at that pressure for the full length of [the] shoe to afford time for the water to travel into the felt." (File Wrapper Re. 20,268 at 13) (emphasis added).

47. During the prosecution of the application, Beloit added to Claim 10 the limitation that the shoe have substantially the same radius of the roll so that dewatering pressure extends along the full length of the shoe. That limitation was therefore critical to the allowance of the claim.

48. The Examiner initially rejected claim 10 of the reissue patent because the East German Patent disclosed a shoe having a concave surface that is pressed toward a rotating roll. (File Wrapper Re 30,268 at 29). In reply, Beloit's attorneys argued that in claim 10 the concave surface is recited as being "substantially the radius of the roll" and asserted that such a relationship would be contrary to the East German Patent and destroy the principle espoused in the German patent. (File Wrapper Re 30,368 at 34–35).

49. Beloit argued that under the East German patent, the shoe could not be "substantially" the same size as the roll since that would make it impossible to achieve

patentee's chief objective: the provision of a point of maximum pressure.

50. The Patent Examiner again rejected Claim 10 on the grounds that the applicant had not defined "substantially" in relation to the radius of the roll. The examiner indicated that the radius of curvature of the roll could be somewhat larger than the roll, (so that a point of maximum pressure is achieved), and still have "substantially" the same radius of the roll. (File Wrapper re. 30,268 at 42).

51. In response to this objection, claim 10 was amended to recite that the concave surface of the shoe is "along the full length of the shoe so that a dewatering pressure extends along the full length of the concave surface". (File Wrapper re 30,268 at 46, 49).

52. In the original reissue application, Claim 1 already contained the language that the shoe surface must be "concave arcuately shaped so that a dewatering pressure extends along the full length of the shoe." (File Wrapper re 30,268 at 7).

53. Based on Beloit's characterization, increased total time under *maximum* pressure is the essence of the Justus application and of the limitations added to Claims 1 and 10. Any other interpretation of the claim language would be meaningless.

54. By the words "dewatering pressure," the Examiner could not have meant just any pressure, since all shoes provide some pressure between their ends. The East German patent already disclosed a shoe that operated under those principles.

55. Claims 1 and 10 describe only an arrangement that produces a roughly quadrangular pressure curve, and not a structure producing a roughly triangular pressure curve.

56. In so finding, the Court finds it unnecessary to resolve the dispute as to which translation (the defendant's or the plaintiff's) more accurately describes the East German patent. The necessity of the limitations in claims 1 and 10 is adequately supported by both.

57. The parties differ in particular over the interpretation of one key section of the East German patent. As interpreted by Beloit, the East German patent states that "the advantages of the invention are mainly due to *the increase in the compression zone* and the faster pressure release and separation of fibre web and felt blanket that take place at the rounded end of the shoe...." (Defendant's Trial Exhibit 6 at 4). The section underlined above is ambiguous. It could be interpreted as stating either (1) that the length of the entire press nip is increased; or (2) that only the length of the feed-in, pressure-increasing part of the nip is increased. The ambiguity stems from the use of the phrase "compression zone." Throughout its version of the East German patent, Beloit uses the term "compression gap" or "pressure zone" to describe the nip and "compression path" to describe the oncoming, pressure-increasing part of the nip. It is unclear to which the term "compression zone" refers.

58. In its translation, Voith uses the term "effective zone," referring to the full length of the nip.

59. The Court finds that Voith's interpretation is more accurate and precise, but it finds that Beloit did not actually mislead (or intend to mislead) the Examiner by its interpretation. The East German patent as a whole teaches the importance of increasing the time spent in the nip. *See, e.g.,* Defendant's Trial Exhibit 6 at 2 (discussing the limitations of high speed presses with rollers because of the short time spent in the nip).

60. In its commercial extended nip press, Beloit itself does not maintain maximum pressure over the whole length of the shoe.

ii. *Rotation or Pivoting about an Axis:*

61. The Justus Reissue patent requires the existence of a pivot, or its equivalent, which permits the shoe to rotate about a single axis.

62. Both of independent claims 1 and 10 of the Justus Reissue recite that the shoe pivots in its motion and that this pivoting is about a single axis.

63. Claim 1 of the Justus Reissue recites that there are "means for pivotally supporting the shoe about a pivotal axis extending transversely of the direction of the belt travel...." (Col. 6, lines 3–5). Beloit requested this language in its application for the Justus Reissue patent. (File Wrapper re 30,268 at 7).

64. Claim 10 of the Justus Reissue recites that there are "means supporting said shoe accomodating movement of the shoe about an axis parallel to the axis of the roll" (Col. 7, lines 30–32). This language was added to claim 10 following a specific request from the Examiner. (File Wrapper re 30,268 at 49).

d. *Voith Flexonip Press:*

65. Voith's Dr. Steiner determined the desirability of a long nip press from studying certain Wahlstrom articles in 1977.

66. Since at least the 1960's, it was well known that for heavier paper grades, a long nip is beneficial with respect to solid contents of the paper and other paper properties.

67. Dr. Steiner began research on an extended nip press in 1977. Dr. Steiner's work consisted of collecting literature, thinking about different types of long nips and discussing them and making studies and tests.

68. During the late 1970's, Mr. Henseler took over his position as executive of Voith in charge of paper making machinery.

69. Mr. Henseler had predicted there would be more interest in brown paper machines in North America. The prediction has been correct.

70. Mr. Henseler requested that more time be spent at Voith on research for brown paper machines. Linerboard is an example of brown paper. This resulted in Voith discussing improvements in the design of the press section.

71. In 1979, under the direction of Henseler, Voith established a working group with the objective of developing a press with a wide nip.

72. The working group considered the following type of presses: chain presses, hydrostatically pressed long nip presses, a long nip press with a shoe, an air press, a magnetic press, a press with rubber covered rolls, and massive steel bands.

73. A number of ideas were produced by the working group, all of which were eventually discarded except the concept of the accused Flexonip which made a positive impression on all involved.

74. Christian Schiel, a mechanical engineer, was the chief designer of the Voith Flexonip long nip shoe press and of the cooperating Profilroll counter roll for the Chesapeake PM3 paper making machine.

75. Christian Schiel has had more than 30 years experience in the production of paper making machinery and is an experienced, knowledgeable designer of such machinery.

76. In designing the shoe press and the Profilroll, Schiel applied concepts that had already been disclosed by the East German patent and in addition he made certain pioneer inventions and discoveries in the field.

77. While it is true that Voith obtained information about the Beloit extended nip press during the development of its own Flexonip press, Voith did nothing more than what is normal in a competitive business: it kept abreast of the activities of its competitor.

78. Beloit itself has on numerous occasions sought and obtained information on Voith's Flexonip installations.

i. *Flexonip Press: Shoe Substantially the Size of the Roll:*

79. The radius of Voith's shoe is substantially larger than that of its roll, as those terms are defined by the Beloit patent.

80. In the Voith Flexonip press for Chesapeake, the diameter of the counter or Profil roll is 1144 mm., giving it a radius of 572 mm. The shoe in the Voith Flexonip press for Chesapeake used with the above-noted Profil roll has a radius of internal curvature of 620 mm. The radius of the

shoe is greater than the radius of the Profil roll by 48 mm.

81. Normally passing through the nip of a long nip press are the belt, tube or sleeve, an oil film, two felts and a web. The belt has a thickness of approximately 3 mm.; the oil film can be neglected. The two felts each have a thickness of 2.5 mm. This makes a total sandwich of 8 mm. plus or minus a few tenths of a millimeter, including the web.

82. The Voith Flexonip press produces an actual pressure profile that has a more gradual rise followed by a less gradual, more rapid descent. This is quite different from the pressure profile that Beloit said must be obtained if the invention of the Justus reissue is practiced, and it is instead comparable to that profile which the East German prior art press produces.

83. In the Flexonip press for the Chesapeake PM3 machine, Voith seeks to establish a pressure distribution curve in the nip of the Flexonip press which is a triangle with a hump, but not a point, on the top, wherein the entire triangle can be symmetrical or can be tilted.

ii. *Rotation or Pivoting about an Axis:*

84. Voith's Flexonip press shoe lacks a pivot, but is instead free floating.

85. In the Voith Flexonip press which is to be installed in the Chesapeake PM3 papermaking machine, the shoe which opposes the roll and the piston on which that shoe is carried are unified into a structure wherein the shoe and the piston cannot move relative to one another and instead move as one integral unit. The integral unit is supported in a hydraulic fluid-filled cylinder which is pressurized to force the shoe against the roll.

86. In Voith's Flexonip press, the cylinder in which the piston is supported is sealed around the piston with seals having sufficient yieldability and flexibility that the piston may orient itself in the cylinder so that the shoe can achieve an equilibrium orientation with respect to the roll.

87. The Beloit extended nip press shoe, in both the Justus reissue patent and in Beloit's commercial presses, and the shoe on the Voith Flexonip press on the Chesapeake PM3 machine do not operate in the same way. The Beloit shoe has a piston which moves vertically in a guided manner, while the shoe pivots atop the piston on a pivot rod. The Beloit shoe is thus positioned by the top roll and also by the pivot rod. In the Voith Flexonip press, the shoe is free-floating. It floats against the surface of the top roll and is positioned by that roll. The Voith shoe is not positioned by any pivot. The Voith shoe can move or tilt in any direction as long as it has not reached the end position or touched the top roll.

88. In the Voith Flexonip press, there is a clearance space around the side of the shoe to the side wall that defines the opening in the cylinder in which the shoe is received. The clearance may be as much as 4 mm. Voith's purpose for the clearance was not to improve the tiltability of the shoe. That was not a major consideration. Instead, this design feature was adopted to accomodate factors such as thermal distortion of the shoe and to permit free movement and unrestricted positioning of the shoe against the roll. Unrestricted positioning of the shoe is important to assure the desired pressure profile through the nip in the machine direction. Voith's design philosophy was to raise the shoe against the roll and to keep it freely positioned against the roll as unrestricted as possible.

89. The shoe of the Voith Flexonip press is free to move in three mutually perpendicular X, Y and Z planes, three-dimensionally.

90. The shoe of the Voith Flexonip press does not pivot around its center of mass. The axis about which the shoe moves depends at any given point on the balance of forces. There is one point of a body about which all forces are balanced. That point can be identified mathematically. If these forces change, however, the position of an imaginary axis that passes through the equilibrium point also changes. The forces exerted on the Voith shoe will

depend on thermal conditions, on irregularities in the web passing through the press, and on the level of pressure exerted by the fluids in the cylinder.

### e. *Prior Art to the Justus Reissue Patent:*

91. The level of ordinary skill of a worker in the art at the time of making of the invention disclosed and claimed in Re. 30,268, which is at the time just prior to the filing of the patent application,-is that of a graduate engineer or mechanic or designer having mechanical experience, and one who has had experience in papermaking and/or the design and building of papermaking machines, and particularly one having knowledge and experience in the pressing of paper for removing water therefrom during the manufacture of paper, and the machinery and methods used in pressing.

92. Although Voith relies on a variety of prior art, its primary argument is that the Stenberg patent, U.S. Patent 3,556,939, in combination with the East German patent, teaches a pivotally mounted shoe in a hydrodynamic extended nip press. The East German patent lacks only the pivot, which Voith claims is taught by the Stenberg patent. Voith claims that the use of a pivot is also taught by Beloit's Controlled Crown Roll Shoe. (Defendant's Trial Exhibits 11, 12, and 13).

93. Voith's argument depends on the Court's concluding that the East German patent or the Stenberg patent teach all of the claims contained in the Justus Reissue except for the pivot. However, neither teach the achievement of maximum pressure over the full length of the nip, a limitation the Court has found essential to the Reissue patent. Thus, the Justus Reissue patent is not rendered obvious by the prior art cited by Voith.

94. However, if the prior art did teach all of the claims contained in the Reissue except for the pivot, the Court would be inclined to find the use of a pivot obvious. The Stenberg patent shows a hydrodynamic shoe press. One of the shoes in Stenberg is pivotally mounted and it is capable of pivoting to an equilibrium position. (Defendant's Trial Exhibit 10).

95. Similarly, a pivotally mounted shoe is known from Section 22, especially page 22–7, of the Handbook of Fluid Dynamics, First Edition 1961, published by McGraw Hill Book Co., Inc. (Defendant's Trial Exhibit 17).

96. A pivotally mounted shoe is known from Beloit's Controlled Crown Roll Shoes as well. (See, e.g., Defendant's Trial Exhibit 12).

## C. GUIDE PATENT REISSUE:

### a. *Reissue Background:*

1. U.S. Reissue Patent Re. 31,923 was issued June 25, 1985 to Edgar J. Justus and Arnold Roerig on an application filed August 1, 1983. It is a continuation of reissue application Serial No. 403,122 filed July 29, 1982. That application, in turn, was for reissue of U.S. Patent 4,287,021, issued September 1, 1981 on an application filed August 27, 1979. Patent Re. 31,923 is hereafter described as the guide patent.

2. The guide patent is an effort to provide an extended nip press, such as that shown in the Justus reissue, with an alternative arrangement for supporting and guiding the belt that passes over the shoe surface, whereby the path of travel of the belt remains under control without deviation at the high speeds required for pressing the web in a papermaking machine.

3. Beloit claims not to have manufactured either experimentally or commercially a product which is made according to the guide patent.

### b. *Purpose and description of patent:*

4. Prior to the invention disclosed and claimed in the guide patent, it was conventional to guide belts and felts by stretching them tightly over support and guide rolls.

5. The development of the extended nip press presented new problems, requiring that a belt be driven through a long nip having a concave pivotally moveable shoe

on one side and a roll on the other, with a wedge of oil between the belt and the shoe.

6. The invention disclosed and claimed in the guide patent was devised to simplify the then-existing extended nip belt guide arrangement by reducing the number of parts.

7. Mr. Roerig, the inventor, designed the belt guide by taking a piece of material similar to a belt and restraining it in the configuration that could be expected in the area of the extended nip. He then looked at the contour of the remaining belt material as it would be in its free running shape. The guide was devised to accomodate this shape and it insures free running of the belt by maintaining a small gap between the guide surface and the belt.

8. In the guide patent, the guide means is used to control flutter and to place some residual tension or initial tension on the belt.

c. *The Claims of U.S. Patent Re. 31,-923:*

9. The guide patent describes an internal guide for a free running open-ended belt that passes over the shoe.

10. The extended nip structure with the guide means is shown in Figure 1 of the patent. The "apple shaped" structure shown therein permits continuous movement of an endless circular belt 25 in a closed loop passing through the extended nip. The shell inside of the belt 25 has dimensions less than that of the belt so as to provide a free space 28 between the belt and the outer smooth surface of the shell, so that the belt is self-aligning around the circumference of the shell. If the space 28 were not present, the belt 25 would contact the shell and would be aligned thereby, rather than being self-aligning.

11. Beloit alleges that Voith is infringing claims 1, 2, 3, 4 and 6. All of these claims are dependent on claim 1.

12. Claim 1 of the guide patent recites a guide means within the belt for guiding and supporting the belt as it passes over the shoe. The guide means is recited in Claim 1 as having "an outer smooth curved surface of a circumference slightly smaller than the belt to provide a continual smooth sliding surface for the belt so that the belt is self-aligning wherein the belt is guided along substantially the entire circumference of the guide means." (Col. 4., lines 10–17).

13. Where the guide patent refers to a continual smooth sliding surface, the inventor had in mind a means of training the belt around its more or less natural shape. A "continual" surface was meant to be something that was repeated often enough that it would produce the desired shape.

14. The phrase "sliding surface" as that phrase is used in the context of a "continual smooth sliding surface" means a surface which the belt could slide over without becoming damaged.

15. The term "self-aligning" as used in the guide patent means that the belt is self-aligning in the machine direction or the circumferential direction, and that it is able to follow its natural path.

16. The term "self-aligning" does not necessarily mean self-aligning in the cross-machine direction. (However, in so finding, the Court is not implying that the circular heads on Voith's Flexonip press are simply means to align the belt in the cross-machine direction. The Voith Flexonip press operates under a different principle).

17. To provide means to accomodate shifting of the belt in the cross-machine direction would be self-understood by those familiar with the operation of such equipment.

18. If no guide means were provided in the structure described and claimed in the guide patent, the belt would follow its natural path around. However, when the machine is shut down, or when the shoe in the nip is unloaded, the belt could flutter. The guide patent describes a means to contain the belt under these conditions.

19. Under the guide patent, when one opens or closes the nip, or when other

unstabling conditions occur, the belt touches the guide.

20. An equivalent guide means could be an endless piece or it could be a series of sections or rollers arranged to form a circumference slightly smaller than the natural path of the belt.

### d. *The Voith Flexonip press:*

21. The Voith Flexonip press has no belt.

22. The Voith Flexonip press uses a tube that passes over the shoe in place of a belt. The tube is secured to circular heads located outside both of its ends. The circular heads give the tube its circular shape irrespective of what is inside the tube.

23. In the Flexonip press, the installed tube is always stretched under tension in the cross machine direction by springs which push apart the circular rings at the lateral ends of the tube. These spring biased rings hold the tube generally in a circular shape without the tube contacting the rails.

24. The Flexonip press has a beam with rails inside the tube. These rails are not equivalent to the smooth, continual surface described in Beloit's guide patent.

25. In the Flexonip press to be installed on the Chesapeake PM3 papermaking machine, there is an I-shaped cross-section beam inside the tube for containing the hydraulic cylinder in which the shoe-piston integral unit is supported. To that beam are attached four elongate rails which extend in the cross machine direction of the machine. Measured circumferentially, each of the four rails occupies a very short distance. All of these rails are located within the upper half of the tube.

26. In the Flexonip press, the rails on the beam are provided to enable initial installation of the tube by sliding the tube along the rails in the cross machine direction. The rails will also provide some uplift to the center of the tube should it sag while the papermaking machine is not in operation.

27. The Voith tube has a diameter selected so that inside the tube there is a minimum clearance of 3 mm. before the tube is inflated with air.

28. Upon inflation of the tube, the diameter of the tube increases, so that it is spaced even further from the rails than in its initial uninflated state.

29. Voith's original laboratory long nip press had a number of rails over which the tube could be slid during installation and removal of the tube from the press. These rails were adjustable radially so that they could stabilize the tube in the event that it vibrated. Adjustments could be made while the machine was running. Vibrations were not experienced and the radial positions of the rails in the laboratory press were never adjusted.

30. In Voith's first commercial long nip press at Nettingsdorf, Austria, the radial position of one of the rails was also adjustable, even while the machine was running. The radial position of that rail was set at the same extent as the other rails, and its position was never adjusted.

31. In contrast, no rail radial position adjustment is included in the Chesapeake Flexonip press.

32. These four rails inside the tube on the Flexonip press on the Chesapeake PM3 machine are not, nor are they equivalent to, "a surface" and the rails do not provide a "continual smooth sliding surface" or the equivalent thereof for the tube. The tube is not guided by the rails along substantially the entire circumference.

33. The rails inside the tube on the Flexonip press are not guide means within the disclosure of or within any claims of the guide patent.

34. There is no element in the Flexonip press that includes an outer, smooth, curved surface of a circumference slightly smaller than that of the belt as recited in claim 1 of the guide patent. There are instead four rails supported on a beam inside the tube, but which occupy less than ten percent of the circumference of the tube which are located within the upper

half of the tube and which are not in contact with the tube as it moves.

35. It is contrary to the design of the Flexonip press for the tube to contact the rails at any time while the belt is moving at machine speed in the machine direction, as that will place unwanted drag upon the belt thereby reducing press efficiency.

36. The Flexonip tube operates under a different principle than the Beloit guide means and belt. The tube on the Flexonip press is closed at its ends. Before the press is started, the tube is inflated, which raises the tube off the installation rails and presses it against the counter roll.

37. In the Voith laboratory press, oil collects in a sump at the bottom of the press tube. Oil also collects at the bottom of the press tube at the Nettingsdorf Flexonip press. It is expected that oil will collect at the bottom of the press belt at Chesapeake.

38. The oil in the tube pools at the bottom and initially pulls the center of the tube down before rotation begins.

39. Upon starting up the press, but before the tube begins to rotate, air blowers are activated to put pneumatic pressure on the inside of the tube to inflate the tube and lift it from a downwardly elongated, sagging shape to a round shape. The lifting of the tube allows siphons at the bottom of the beam in the tube to remove the oil.

40. Once the Flexonip press is running, the air blowers are operated at a lower pressure, because there is no longer an oil sump in the tube. The air pressure holds the tube round.

41. When the tube of the Flexonip press is inflated, and even before the press starts running, no rail inside the tube is contacted by the belt. As the press starts running, the tube still does not contact any rail. Any contact would be observed, while the tube was running, by the resistance to rotation. (*See also* TR December 4, 1985 at 777 (Schiel)) (incident when oil pressure dropped inside tube as evidence that the rails do not touch tube).

42. Absence of contact between the rails inside the tube of the Flexonip press and the tube is a result of (a) circumferential speed of the tube that generates centrifugal force; (b) internal air pressure; and (c) the spring tension on the rings at the end of the tube.

## D. THE BELOIT DRIVE PATENT:

### a. *Beloit Drive Patent:*

1. U.S. Patent 3,889,334 was issued on June 17, 1975, on an application filed August 1, 1972 by Edgar J. Justus and Arnold J. Roerig. The patent concerns a controlled deflection roll drive. Hereafter, it is referred to as the "drive patent".

2. The drive patent discloses a drive for rotating the counter roll of an extended nip press. The drive patent describes a roll shell 10 in a paper making machine which is driven to rotate by a ring gear 17 disposed on the exterior of an axial extension of the roll shell. That ring gear 17 rotates with its teeth in mesh with the teeth of a drive pinion 18 that is disposed radially outward of the ring gear. The rotation of the pinion in turn rotates the ring gear and thereby the roll shell.

3. The roll shell 10 is deflectable in use. That deflection of the roll shell causes the ring gear 19 supported thereon to tilt; that is, the axis of the ring gear tilts slightly as the roll shell deflects. For proper mechanical operation of the disclosed drive, the pinion 18 should remain in mesh with and its axis should remain in alignment with the axis of the ring gear as the ring gear tilts, whereby the axis of the pinion should correspondingly tilt. When the axis of two gears are parallel, the teeth of these gears are drive aligned. However, the drive shaft connected to the pinion 18 is not capable of tilting. Therefore, there is a flexible connection 24 between the drive shaft to the pinion and the pinion itself, such that the flexible coupling will absorb any tilting of the axis of the pinion. The patent discloses a flexible coupling between the drive shaft 20 and the pinion 18 in the

form of a crown splined coupling 24 disposed axially at the center of the pinion 18.

4. In the embodiment of the drive shown in the Beloit drive patent, besides the spline coupling 24 and the mesh of the teeth of the pinion with the teeth of the ring gear, no other element determines the tilt or cant of the axis of the pinion.

### b. *Validity of Beloit Drive Patent:*
#### i. *Operability:*

5. In Beloit's Drive Patent, the ring gear 17 and the pinion gear 18 have respective meshing teeth. It is their teeth alone which have the purpose of holding the gears in alignment.

6. As explained by Mr. Schiel in his direct testimony, in the only embodiment of gear drive shown in the Beloit drive patent, when the ring gear tilts, its tooth mesh with the pinion also causes the pinion to tilt, in an attempt to achieve that drive alignment of the gears. However, when the pinion tilts around the spline coupling at its center, the spline connection then generates moments of force that tilt the pinion around an axis that is generally perpendicular to the line of action. In other words, the axis of the pinion turns so that it passes across the axis of the ring gear. This means that one end of the pinion is partially turned in toward the ring gear.

7. The only force that the drive patent describes for aligning the axis of the pinion with the axis of the ring gear is the drive aligning force of the meshing gear of the pinion and the ring gear. However, the tooth forces in the spline coupling exceed the drive aligning forces in the tooth mesh, so that the pinion axis cannot align with the ring gear axis when the ring gear has been deflected.

8. Voith did not prove the degree of misalignment in such a situation. The Beloit drive patent would appear to be operable, although there may be some misalignment that would cause wear on the gears. *See* TR December 5, 1985 at 945 (Dr. Seirig) (stating essentially that the gears in the model simulating the drive patent were slightly misaligned but stable).

9. Beloit claims neither to have designed nor built a drive according to either the disclosure or the claims of the drive patent. However, a working drawing has been prepared by Beloit.

#### ii. *Prior Art Relied on by Voith in U.S. Patent 3,889,334:*

10. The level of ordinary skill of a worker in the art at the time of the making of the invention disclosed and claimed in Patent 3,889,334 which is at the time just prior to the filing of the patent application is that of a graduate engineer or mechanic or designer having mechanical experience, and one who has had experience in papermaking and/or the design and building of papermaking machines, and particularly one having knowledge and experience in the pressing of paper for removing water therefrom during the manufacture of paper, and the machinery and methods used in pressing.

11. Defendant Voith cites various patents as prior art to the Beloit drive patent. The prior art on which it primarily relies is illustrated in defendant's exhibit 242–A. The patents cited as prior art are the Andriola patent, the Whittum patent, and the Danielsson patent. Although these patents contain similar or identical structural elements, as systems they differ. As Beloit's witness, Dr. Seirig, stated, "[i]t is the system, putting the system together [that] is the novel idea." TR December 3, 1985 at 332. For this reason, the prior art does not render the Beloit invention obvious. However, for the same reason, the Voith Flexonip drive does not infringe the Beloit patent. It is a different system that operates under a different principle. In fact, in terms of novelty, it far surpasses the Beloit invention.

12. The Beloit drive as described in the patent is designed to permit the roll shell in the extended nip press to deflect without misaligning the gears that drive the roll. Before Beloit's patent was issued, the standard way of treating this problem of deflection was to create a flexible connection so that the ring gear would articulate with

respect to the roll shell. This approach is found in the Andriola patent, a patent cited as prior art by Voith.

13. U.S. Patent 3,855,681, issued to Andriola and assigned to USM Corporation, contains the same elements as appear in the Beloit drive patent. However, in Andriola, the ring gear is coupled to the roll shell through a spline, with the pinion meshed with the ring gear.

14. Conventional constructions put the articulation where it occurred. The Beloit invention departed from the conventional construction.

15. The differences between the inventions of the claims at issue and the Andriola patent are such that the inventions would be nonobvious to one having ordinary skill in the pertinent art.

16. U.S. Patent 3,855,681, Andriola, was before the PTO during the time of prosecution of the application of the drive patent; it was in an interference proceeding with the application of the drive patent in the U.S. Patent Office; and Andriola was issued by the U.S. Examiner on December 24, 1974. The issuance date of the drive patent was June 17, 1975.

17. The Whittum patent, U.S. Patent 2,965,920, assigned to Farrel Birmingham, embodies some of the same basic elements as the Beloit drive patent: splines, gears, herringbone design. However, it is again a different system. The Whittum patent relates to a standard calendar stack with one driven roll. The herringbone gears are connected, one to each roll, and they synchronize the two rolls.

18. The differences between the inventions of the claims at issue and prior art U.S. Patent 2,965,920, Whittum, are such that the inventions would be nonobvious to one having ordinary skill in the pertinent art.

19. For similar reasons, the differences between the inventions of the claims at issue and prior art U.S. Patent 3,678,775, Danielsson, are such that the inventions would be nonobvious to one having ordinary skill in the pertinent art.

20. The differences between the inventions of the claims at issue and prior art as a whole are such that the inventions would be nonobvious to one having ordinary skill in the pertinent art.

21. The best prior art was before the Examiner and was considered by the Examiner during prosecution of the application of the drive patent.

c. *Infringement of the Beloit Drive Patent:*

22. Beloit claims infringement of claims 1, 2, 3, 5, 6, 7, and 9 of the drive patent. Claim 1 is an independent claim and all remaining claims are dependent on it.

23. Claim 1 of the drive patent requires drive aligning teeth. Claim 1 of the drive patent, in agreement with the specification, recites that the pinion and the ring gear have drive aligning teeth between them which are provided for the purpose of holding the pinion in alignment with the ring gear. (Col. 3, lines 43–45). To meet this claim limitation, it is the meshing of the two gears that must function to hold the gears in alignment.

24. The drive patent indicates that there is full alignment between the axes of both gears, meaning alignment around every axis of rotation or tilt of each gear. Claim 1 requires that such alignment around all axes be caused by the mesh of the drive aligning teeth.

25. The Voith drive operates under a different principle than that described in the Beloit drive patent. In the Voith drive, in order to assure that the two gear axes would be aligned when the ring gear is not tilted as well as when it is tilted, Voith first applies a tilting force through a double spline connection which misaligns the pinion and the ring gears. Voith then places restraining elements in the path of such misaligned tilting which halts the tilting just as the gears are in alignment. This concept of forcing misalignment until realignment occurs is markedly different than the Beloit drive concept, operates quite differently and does not primarily or solely

rely upon the meshing gear teeth to effect gear alignment.

26. In the Voith drive, the drive shaft for the pinion is slightly offset from the axis that the pinion would have if the pinion were aligned with the axis of the ring gear on the roll shell. An eccentric jack shaft is double spline connected between the drive shaft for the pinion and the pinion itself. The jack shaft is inclined at an angle to the aligned axes of both the ring gear and the pinion.

27. The initial change in alignment of the Voith drive gears is accomplished by the jack shaft. Its spline connection to the drive shaft causes the jack shaft to act like a crank and try to swing the pinion eccentrically around the axis of the drive shaft. Its spline connection to the pinion is axially offset from the axis of the pinion and from the free swivel bearing on which the pinion is mounted. The combined effect of the two spline connections is to swing the pinion around its bearing toward an orientation at which it is tilted and misaligned with respect to the ring gear. Both the pinion and the ring gear carry respective coaxial disks or pitch cylinders, axially spaced from the respective gears and so sized and positioned that when the jack shaft drives the pinion toward misalignment, that motion firmly swings the pitch cylinders into abutment at the moment the pinion and ring gears are aligned. Hence, initial alignment of the gears is not accomplished by the meshing teeth of the pinion and the ring gear but by another unit.

28. After initial alignment, if the roll shell deflects and tilts the ring gear, then misalignment between the ring gear and the pinion occurs. The shaft of the ring gear then lifts upwardly, which causes a gap between the two pitch cylinders or disks on the respective gears. The eccentric double splined jack shaft again drives the pinion on its spherical bearing to tilt until the pitch cylinders or disks contact one another, which then opposes the tilting force applied by the drive shaft. There is again exact alignment of the pinion and ring gear, which has a beneficial effect in operation of the drive system because the gears have good distribution of the load and last longer. This results in less wear on the teeth because the gears are not offset. The gears thus do not experience the same friction that one finds in other designs.

29. The tilting motion of the Voith pinion occurs because of a crank effect of the inclined stub shaft and also because of the friction exerted by the spline teeth in their spline connection to the pinion. This mechanism provides the ability for the pinion to realign itself into proper mesh with the ring gear as the latter tilts.

30. As a result of the foregoing, if the Voith press drive were operated without the pitch cylinders, the gears would be driven into misalignment. The meshing gear teeth could not and do not serve to hold the pinion in alignment with the ring gear. The combination of the eccentric jack shaft and the pitch cylinders cause the alignment of the two gears.

## II. CONCLUSIONS OF LAW:

### A. JURISDICTION AND VENUE:

1. This action arises under the patent laws of the United States, 35 U.S.C. 1, *et seq.* This Court has jurisdiction under 28 U.S.C. § 1338(a). Venue with respect to Voith, an alien corporation, is proper pursuant to 28 U.S.C. § 1391(d).

### B. JUSTUS REISSUE PATENT:

#### a. *Claim Construction:*

1. Beloit claims that Voith's Flexonip press infringes claims 1, 3, 10, 11, 12, and 18. Claims 1 and 10 are independent claims. Claims 3, 11, 12 and 18 are dependent on claim 1.

2. In interpreting claims 1 and 10, the court must consider the prosecution history of the patent. *Lemelson v. United States,* 752 F.2d 1538, 1550 (Fed.Cir.1985); *SSIH Equipment S.A. v. United States International Trade Commission,* 718 F.2d 365, 376 (Fed.Cir.1983).

3. The prosecution history includes all express representations made by the applicant to the Patent and Trademark Office ("PTO") to induce the grant of a patent. Such representations include amendments to the claims and also arguments or remarks made by the applicant in support of patentability. *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir.1985); *Coleco Industries, Inc. v. United States International Trade Commission*, 573 F.2d 1247, 1257, 65 C.C.P.A. 105 (1978).

4. Material representations made to the PTO (with or without amendment) to define and explain the claimed invention for the purpose of distinguishing it from the prior art limit the proper interpretation of the claim language. *Builders Concrete, Inc. v. Bremerton Concrete Products, Co.,* 757 F.2d 255, 258 (Fed.Cir.1985); *Coleco*, 573 F.2d at 1257.

5. In this case, Beloit expended a considerable amount of money on researching and developing its extended nip press, only to find later that it had been preempted by the East German patent.

6. The East German patent disclosed a shoe having a concave surface that is pressed toward a rotating roll. It also taught the importance of increased time spent in the nip. Thus, to distinguish its claims from the East German patent, Beloit was forced to limit its claims to a very narrow and specific improvement of the concept of a long nip press.

7. Because of representations and arguments made before the Patent Examiner, claims 1 and 10 describe only an arrangement that produces a roughly quadrangular pressure curve, and not a structure producing a roughly triangular pressure curve. The Court must limit these claims to that particular operation. When an applicant distinguishes prior art and obtains allowance of a structural claim on the basis of the manner in which the claimed structure operates, the claim will be so limited to that operation. *SRI International v. Matsushita Electric Corp.*, 775 F.2d 1107, 1120 n. 13 (Fed.Cir.1985) (en banc).

8. Claims 1 and 10 also require that the shoe be supported in such a manner that it can pivot or rotate about an axis parallel to the axis of the roll.

b. *Infringement:*

9. Each element of a claim is material and essential. Therefore, to show infringement, Beloit must demonstrate the presence of every element (Literal Infringement) or its substantial equivalent (Doctrine of Equivalents) in Voith's accused press. *Lemelson*, 752 F.2d at 1551.

10. Literal infringement requires that the accused device embody every element of the asserted claim. *Builder's Concrete, Inc*, 747 F.2d at 257–58 (Fed.Cir. 1985).

11. If the claims do not read literally on the accused structure, infringement may still be established if the plaintiff establishes that the claimed structure and the accused structure are substantially the same thing, used in substantially the same way to achieve substantially the same result. (Doctrine of Equivalents). The range of equivalents is determined by whether persons reasonably skilled in the art would have known of the interchangeability of an element not contained in the patent with one that was. *Coleco*, 573 F.2d at 1254; *Autogiro Co. of America v. United States*, 384 F.2d 391, 400, 181 Ct.Cl. 55 (1967).

12. With pioneer inventions, the doctrine of equivalents is applied more broadly. Inventions representing only an improvement over the prior art are given a more restricted and narrower application of the doctrine. *Sealed Air Corp. v. United States International Trade Commission*, 645 F.2d 976, 984–85 (Fed.Cir.1981).

13. When a patentee claims only an improvement over an earlier invention, other parties are entitled to practice variations of that prior invention so long as those variations differ from and do not

include the improvement claimed by the patentee. *Sealed Air Corp.*, 645 F.2d at 985.

14. Beloit's invention represents only an improvement over the East German prior art. Its claims must therefore be narrowly construed in applying the doctrine of equivalents. Voith is entitled to practice variations of the East German patent so long as those variations differ from the improvements claimed by Beloit.

15. With respect to rotation about an axis: the Court construes this claim narrowly and finds that a structure is equivalent only if it allows rotation or pivoting about a *single* axis parallel to the axis of the roll.

16. The Voith Flexonip press shoe does not pivot about a single axis parallel to the axis of the roll.

17. The Voith shoe is free-floating and rotates around a variety of axes, the particular axis at any given moment depending on the balance of forces.

18. The Beloit extended nip shoe and the Voith shoe do not operate in the same way and according to the same principles.

19. Therefore, Voith's Flexonip press does not infringe this claim.

20. With respect to the curvature of the shoe in comparison to the radius of the roll: Beloit argued before the Examiner that its invention had an improved operation over the East German prior art and Beloit relied on that argument for patentability. Thus, Beloit is estopped from applying the doctrine of equivalents to that operational limitation. *SRI International*, 775 F.2d at 1120 n. 13.

21. As the terms are operationally defined, the Flexonip press does not have a shoe the curvature of which is substantially the same size as the roll such that dewatering pressure is applied along the full length of the shoe.

22. The Voith Flexonip press produces an actual pressure profile that has a more gradual rise followed by a less gradual, more rapid descent. This is quite different from the pressure profile that Beloit said must be obtained if the invention of the Justus reissue is practiced, and it is instead comparable to that profile which the East German prior art produces.

23. Therefore, the Voith Flexonip press does not infringe this claim.

24. The Voith Flexonip press does not meet the limitations of Claim 1 of the Justus reissue and that claim is not infringed.

25. The Voith Flexonip press does not meet the limitations of Claim 10 of the Justus reissue and that claim is not infringed.

26. The Voith Flexonip press does not infringe any of the claims of the Justus reissue patent.

### iii. *Validity:*

27. A patent is presumed valid, and the burden of establishing invalidity as to any claim of a patent rests upon the party asserting such invalidity. 35 U.S.C. 282.

28. The presumption of validity afforded by 35 U.S.C. 282 does not have independent evidentiary value. Rather the presumption places the burden of going forward, as well as the burden of persuasion, upon the party asserting the invalidity. *Solder Removal Co. v. U.S. ITC*, 582 F.2d 628, 65 C.C.P.A. 120 (1978).

29. The presumption of validity is not affected where the offering party introduces prior art more relevant than that considered by the Examiner. However, the offering party may be more likely to carry its burden of persuasion with such evidence. *SSIH Equipment S.A. v. U.S. ITC*, 718 F.2d 365, 378 (Fed.Cir.1983).

30. The decision of the PTO to issue a patent is never binding on a court. *Fromson v. Advance Offset Plate, Inc.*, 755 F.2d 1549, 1555 (Fed.Cir.1985). *Datascope Corp. v. SMEC, Inc.*, 776 F.2d 320, 327 (Fed.Cir.1985).

### i. *anticipation:*

31. A patent is invalid by anticipation if each element of the claim in issue,

or its equivalent, is found in a single prior art reference, or if the claimed invention was previously known or embodied in a single prior art device or practice. *Structural Rubber Products Co. v. Park Rubber Co.*, 749 F.2d 707, 716 n. 6 (Fed.Cir. 1984); *Kalman v. Kimberly-Clark Corp.*, 713 F.2d 760, 771 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984); *Tate Engineering, Inc. v. United States*, 477 F.2d 1336, 1342, 193 Ct.Cl. 1088 (1973).

32. If a claim has several embodiments, then the claim is anticipated and invalid if even only one embodiment is in the prior art. *Titanium Metals*, 778 F.2d 775, 782 (Fed.Cir.1985).

33. No prior art anticipates the Justus Reissue. The Justus reissue claims an operational improvement not found in the prior art: the attainment of maximum pressure over the length of the shoe.

### ii. *obviousness:*

34. A patent is invalid because of obviousness if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. 35 U.S.C. 103. *See Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 453 (Fed.Cir.1985).

35. In making a determination on obviousness, several factual inquiries must be made, including the scope and content of the prior art, the differences between that art and the claimed subject matter, and the level of ordinary skill in the subject art. Secondary considerations such as commercial success, long felt need, etc., should also be considered as indicia of obviousness or nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966); *Vandenberg v. Dairy Equipment Co.*, 740 F.2d 1560, 1564 (Fed.Cir.1985); *Orthopedic Equipment Co. v. United States*, 702 F.2d 1005, 1008 (Fed. Cir.1983).

36. With the Justus reissue, the Court is unable to consider secondary considerations such as commercial success. Before secondary considerations become relevant to the issue of obviousness, a nexus must be established between the merits of the claimed invention and the evidence of secondary considerations. For example, with commercial success, the success must be shown to have in some way been due to the nature of the claimed invention. *Cable Electric Products, Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1026 (Fed.Cir.1985); *Vandenberg v. Dairy Equipment Co.*, 740 F.2d 1560, 1567 (Fed.Cir.1984).

37. No nexus has been established between the secondary considerations and the claimed inventions. For instance, although Beloit's commercial extended nip press has been successful in the market, Beloit has not proved any nexus between this success and this invention. The success is attributable to the invention disclosed in the East German patent which taught the concept of an extended nip press.

38. Even so, the Court finds that the differences between the inventions of the claims at issue and the prior art considered as a whole are such that the inventions would be nonobvious to one having ordinary skill in the pertinent art.

39. No prior art teaches the achievement of maximum pressure over the full length of the nip, a limitation the Court has found essential to the Reissue patent. Such an improvement would be nonobvious to one having ordinary skill in the pertinent art.

40. The Court notes that if the prior art did teach all of the claims contained in the Reissue except for the pivot, the Court would be inclined to find the use of a pivot obvious. The Stenberg patent shows a hydrodynamic shoe press. One of the shoes in Stenberg is pivotally mounted and it is capable of pivoting to an equilibrium position.

41. Similarly, a pivotally mounted shoe is known from Section 22, especially plate 22–7, of the Handbook of Fluid Dynamics,

First Edition 1961, published by McGraw Hill Book Co., Inc.

42. A pivotally mounted shoe is known from Beloit's Controlled Crown Roll Shoes as well.

43. The Court has some doubts as to the operability of the claimed invention, *i.e.*, whether maximum pressure along the full length of the shoe could be attained. A claim must clearly recite a structure which is capable of performing its purported function, *i.e.*, the claim must recite an operative system. *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 956 (Fed.Cir. 1983), *cert. denied*, —— U.S. ——, 105 S.Ct. 127, 83 L.Ed.2d 69 (1984); *General Electric Co. v. United States*, 572 F.2d 745, 778, 215 Ct.Cl. 636 (1978); *Noma Lites Canada Ltd. v. Westinghouse Electric Corp.*, 399 F.Supp. 243, 251, 253 (D.D.C. 1975). However, the Court finds that Voith has not proved by a preponderance of the evidence that Beloit's patented structure is not operable.

44. On these grounds, the Court finds U.S. re. 30,268 to be valid.

## C. GUIDE PATENT, U.S. re. 31,923:

### a. *Infringement:*

1. Beloit alleges that Voith is infringing claims 1, 2, 3, 4, and 6 of the guide patent. All of these claims are dependent on claim 1.

2. Claim 1 of the guide patent recites a guide means within the belt for guiding and supporting the belt as it passes over the shoe. The guide means is recited in Claim 1 as having "an outer smooth surface of a circumference slightly smaller than the belt to provide a continual smooth sliding surface for the belt so that the belt is self-aligning wherein the belt is guided along substantially the entire circumference of the guide means." (Col. 4, lines 10–17).

3. The Voith Flexonip press does not infringe the guide patent. The Voith Flexonip press operates on a totally different principle. It has no belt. Instead, it has a tube which is inflated upon operation. Although the press has rails inside the tube, these rails are provided to permit initial installation of the tube by sliding the tube along the rails in cross machine direction.

4. The four narrow widely spaced rails of Voith's Flexonip press do not define a "guide means having an outer smooth surface of a circumference slightly smaller" than the inflated tube.

5. The four narrow widely spaced rails of Voith's Flexonip press do not "provide a continual smooth sliding surface" for the tube.

6. The tube in the Voith Flexonip press is not guided in its motion along the "entire circumference" of a guide means, as that term is used in claim 1, because the support in the Flexonip press is provided by elevated internal pressure.

7. The Voith Flexonip press does not infringe claim 1 of Beloit's guide patent, and thus does not infringe any of the remaining dependent claims.

### b. *Validity:*

8. Voith did not seriously challenge the validity of the Guide patent.

9. The Court finds nonetheless that the best prior art was before the Examiner who was in charge of the patent application of the '923 patent in the U.S. Patent Office and he properly allowed the patent over that prior art.

10. The differences between the inventions of the claims at issue and prior art taken as a whole are such that the inventions would be nonobvious to one having ordinary skill in the pertinent art.

## D. BELOIT DRIVE PATENT:

### a. *Infringement:*

1. Beloit claims infringement of claims 1, 2, 3, 5, 6, 7, and 9 of the drive patent. Claim 1 is an independent claim and all remaining claims are dependent on it.

2. Claim 1 of the drive patent requires drive aligning teeth. Claim 1 of the drive

patent, in agreement with the specification, recites that the pinion and the ring gear have drive aligning teeth between them which are provided for the purpose of holding the pinion in alignment with the ring gear. (Col. 3, lines 43–45). To meet this claim limitation, it is the meshing of the two gears that must function to hold the gears in alignment.

3. Claim 1 requires that alignment around all axes be caused by the mesh of the drive aligning teeth.

4. The Voith drive operates under a different principle than that described in the Beloit drive patent. In the Voith drive, in order to assure that the two gear axes would be aligned when the ring gear is not tilted as well as when it is tilted, Voith first applies a tilting force through a double spline connection which misaligns the pinion and the ring gears. Voith then places restraining elements in the path of such misaligned tilting which halts the tilting just as the gears are in alignment. This concept of forcing misalignment until realignment occurs is markedly different and does not primarily or solely rely upon the meshing gear teeth to effect gear alignment.

5. Thus, even though the Voith drive employs some of the same structural elements, it operates in a markedly different way. Even though it may appear to some to have appropriated the Beloit patent contribution, it has so far changed the principle of the system that it performs in a "substantially different way." It is therefore not an appropriation. *See SRI International*, 775 F.2d at 1123 (reverse doctrine of equivalents).

6. On these grounds, the limitation in Claim 1 of the drive patent that the pinion and the ring gear have drive aligning teeth between them which hold the pinion in alignment with the ring gear is not met by the drive for the Profilroll in the Voith Flexonip press on the Chesapeake PM3 papermaking machine.

7. Claim 1 of the drive patent is not infringed by the drive for the counter roll in the Voith Flexonip press.

8. The Voith Flexonip press does not infringe any of the claims in the drive patent cited by Beloit.

b. *Validity:*

i. *Operability:*

9. Voith suggested that the Beloit drive patent would be inoperable since the teeth alone would be unable to keep the gears in alignment.

10. Although it appears there may be some misalignment of the gears that would cause wear, the Beloit patent appears to be operable.

ii. *Obviousness:*

11. A review of the prior art cited by Voith is contained in the findings of fact. Defendant Voith cites various patents as prior art to the Beloit patent. Although these patents contain similar or identical structural elements, as systems they differ. For this reason, the prior art does not render the Beloit invention obvious.

12. The differences between the invention of the claims at issue and the prior art as a whole are such that the inventions would be nonobvious to one having ordinary skill in the pertinent art.

13. The best prior art was before the Examiner and was considered by the Examiner during prosecution of the application of the drive patent.

14. Beloit's U.S. Patent 3,889,334 is valid.

E. COUNTERCLAIM OF MISUSE OF PATENTS:

1. Voith claims that Beloit misused its patents by (1) suing upon two patents which disclosed and claimed only a hydrostatic shoe press, Nos. 3,784,225 and 3,853,698; (2) suing upon the Busker pressure curve patent, U.S. Patent 3,808,092; and (3) threatening to introduce into the suit the Cronin patent, U.S. Patent 4,398,997.

2. The Court accepts the explanation of events given by Mr. Dirk Veneman, Patent Counsel for Beloit Corporation. *See* Veneman Deposition. Based on his statements,

the Court finds that Beloit's actions were reasonable and that Beloit did not misuse its patents.

Let the Clerk send a copy of these findings of fact and conclusions of law to all counsel of record.